UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND; and HOWARD McDOUGALL, Trustee; | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 09 CV 4721 |
| VANGUARD SERVICES, INC., an Indiana corporation; DRIVER'S, INC., an Ohio corporation; VANGUARD SOUTHEAST, INC., a South Carolina corporation; VMT VANGAURD COMPANIES, INC., an Indiana corporation; VANGUARD SERVICES (CANADA), INC., a Canadian corporation; VANGUARD OF DELAWARE, INC., a Delaware corporation; CROSSSTONE, LLC, an Indiana limited liability Corporation; PINERIDGE INSURANCE CO., INC., a Barbados corporation; V.O. FREIGHT SERVICES, INC., a Delaware corporation; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Judge Thomas M. Durkin |
| Defendants, | ) ) | |
| and | ) ) | |
| WISE ALLOYS, LLC, as assignee and successor in interest to Reynolds Metals Co., | ) ) ) | |
| Citation Respondent. | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiffs, Central States Fund, Southeast and Southwest Areas Pension Fund and Howard McDougall ("the Pension Fund") brought this action against

1

Vanguard Services, Inc.[1] ("Vanguard") for collection of contributions and withdrawal liability under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* R. 1. Specifically, the Pension Fund requested $4,795,327.60 in contributions and $1,332.48 in interest pursuant to 29 U.S.C. §§ 502(g)(2), 515, 1132(g)(2), 1145(b), and 4301(b). R. 1 at 7-8. On August 11, 2009, Judge Lindberg, who was previously assigned to this case, entered judgment in favor of the Pension Fund and ordered Vanguard to pay $4,769,353.60 in unfunded pension withdrawal liability. R. 67. Presently before the Court is Vanguard's post-judgment motion to enforce an indemnification agreement between Vanguard and Wise, pursuant to which Vanguard asserts that Wise is liable for a portion of its withdrawal liability. R. 11; R. 68. Specifically, the Pension Fund claims that Wise is liable for $300,404.69 of Vanguard's withdrawal liability from the Pension Fund. R. 44 at 11, 13. Wise disclaims liability arguing that: (1) it is not an "employer" within the meaning of the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1381, 1391; (2) Vanguard's claim against Wise is untimely; (3) Wise is not bound by the indemnification clause because it did not assume the contract that contained the indemnification clause; and (4) Wise was not the proximate cause of Vanguard's withdrawal liability. R. 45 at 2; R. 59; R. 62. For the following reasons, the Pension Fund's motion to enforce the indemnification

---

[1] Defendants Driver's, Inc., Vanguard Southeast, Inc., V.M.T. Vanguard Companies, Inc., and Vanguard Services (Canada), Inc., are wholly-owned subsidiaries of Vanguard. R. 1 ¶¶ 11-14. Defendants CrossStone, LLC, Pineridge Insurance Co., Inc., and V.O. Freight Services, Inc. are wholly-owned subsidiaries of Vanguard of Delaware, Inc. *Id.* ¶¶ 16-18.

2

agreement between Vanguard and Wise is granted and Wise is ordered to pay an amount to be determined after further briefing.

BACKGROUND

Vanguard was in the business of labor leasing. R. 12 at 2. Vanguard leased its personnel, on a temporary basis, to its client companies to assist in the day-to-day operations of the client companies' businesses. *Id.* As a part of that business, Vanguard was bound by collective bargaining agreements and participation agreements executed between itself and local unions. R. 44 at 2. Pursuant to those collective bargaining agreements, Vanguard was required to make contributions to the Pension Fund on behalf of its employees that were leased to its clients. *Id.*

On March 22, 1989, Vanguard and Reynolds Metal Company ("Reynolds") entered into an agreement entitled "Employee Lease and Service Agreement" (the "'89 Agreement") for labor leasing services. *Id.* at 3. The '89 Agreement described how the personnel services would be provided and administered. *Id.* The agreement stated, in relevant part, as follows:

> Vanguard will pay its employees and provide all fringe benefits in accordance with the Schedule(s) which are attached hereto and made a part hereof . . . . This Agreement and/or attached Schedules may be amended or changed only by the execution of an endorsement or amendment hereto duly executed by Vanguard and CUSTOMER [Reynolds] . . . . This Agreement shall be binding on the parties hereto, their successors, legal representatives and assigns, and no assignment of this Agreement or any interests herein by either party shall be valid without the prior written consent of the other party.

R. 43-3 at 2, 5. The '89 Agreement was signed by David M. Costantino, Vanguard's Corporate Vice President, and John W. VanDyke, Reynolds's Corporate Director of Transportation, *Id.* at 5, and archived in Reynolds's contract administrations department. R. 54 at 6.

On May 1, 1994, Vanguard and Reynolds executed an addendum to the '89 Agreement, titled "Schedule C" (the "May '94 Schedule"). R. 43-4 at 2. The May '94 Schedule applied to Vanguard's leasing of personnel to Reynolds's plant in Muscle Shoals, Alabama, and detailed various terms of the leasing agreement, including wage rates, fringe benefits, workers' compensation arrangements, and service charges. *Id.* The May '94 Schedule contained the following indemnification clause:

> Customer [Reynolds] agrees to defend, indemnify and hold Vanguard harmless from any unfunded pension liability that might be assessed against Vanguard under any collective bargaining or participation agreement as a result of supplying leased employees to any of Customer's terminals.

*Id.* Immediately following this type-written clause was the following handwritten qualification: "Customer's obligations under this provision shall be limited to assessments received by Vanguard prior to May 1, 1997." *Id.* The page containing the indemnification clause and the hand-written qualification were initialed by Constantino and VanDyke. *Id.*; R. 43-4 at 5. The May '94 Schedule was approved and archived by Reynolds's contracts administrations department. R. 45 at 4. Vanguard did not make any assessments against Reynolds for any unfunded pension liabilities from May 1, 1994 through May 1, 1997. R. 45 at 4.

4

On September 12, 1994, Vanguard and Reynolds amended the May '94 Schedule with an agreement also titled "Schedule C" (the "September '94 Schedule"). R. 43-5 at 2; R. 43-1 at 8. The September '94 Schedule replaced the May '94 Schedule. *Id.* The September '94 Schedule revised the terms regarding wage rates, layover allowances, paid holidays, and pension, health, and welfare contribution rates. R. 44 at 4; R. 43-4; R. 43-5. The September '94 Schedule included the same indemnification clause as the May '94 Schedule. R. 43-5 at 2. However, the September '94 Schedule did not include the handwritten qualification contained in the May '94 Schedule limiting Reynolds's indemnification liability to assessments received by Vanguard prior to May 1, 1997 or any other similar limitation. *Id.* The September '94 Schedule was signed by Vanguard's Senior Account Manager, Jay Wiesenberger, and Reynolds's Fleet Manager, Joe Hutchins. *Id.* at 6. Unlike the '89 Agreement and the May '94 Schedule, the September '94 Schedule was not archived in Reynolds's contract administration department. R. 59 at 6. Nevertheless, after the parties executed the September '94 Schedule, Reynolds made payments to Vanguard consistent with the wage and fringe benefit rates set forth in the September '94 Schedule. R. 44 at 5.

On December 30, 1998, Wise bought Reynolds's Muscle Shoals metal-alloy plant through an asset purchase agreement. R. 46-2 at 90. Disclosure Schedules 4.3(d) and 4.3(h) of the Asset Purchase Agreement memorialized the sale and contained a list of the liabilities and obligations that Wise assumed from Reynolds. R. 46-2 at 95-98, 167-68, 170-173. Disclosure Schedule 4.3(d) listed the '89

5

Agreement with Vanguard, but did not list either the May '94 Schedule or the September '94 Schedule. R. 46-2 at 167-68.

On January 5, 1999, Reynolds sent Vanguard a letter notifying it of the sale to Wise and requesting Vanguard's consent to assign the '89 Agreement to Wise. R. 43-7 at 2. Specifically, the letter stated that Wise would:

> . . . . assume all of Reynolds' [sic] obligations under the Agreement(s) arising after the closing date of the sale, which currently is scheduled for January 29, 1999. Accordingly, Reynolds requests your consent to the assignment of the Agreement(s) from Reynolds, Partners or Southern to Wise Alloys LLC, effective upon the closing date of the sale.

R. 43-7 at 2. Costantino signed the section of the letter titled "consent granted" on January 7, 1999. *Id.* On April 1, 1999, Wise took over the Muscle Shoals plant's operations. R. 44 at 5. Vanguard continued to provide its labor leasing services to Wise. Vanguard billed Wise for these services at the rates set forth in the September '94 Schedule. Wise paid Vanguard accordingly. *Id.*

On December 28, 1999, Wise sent Vanguard a letter terminating their contractual relationship effective January 31, 2000. R. 43-8 at 2. On January 14, 2000, Vanguard responded to Wise by letter acknowledging Wise's termination of Vanguard's services and directing Wise's attention to the indemnification clause contained in the September '94 Schedule. R. 43-9 at 2. Vanguard attached a copy of the September '94 Schedule and the January 5, 1999 assignment letter. *Id.* The January 14, 2000 letter estimated Vanguard's potential withdrawal liability as to

6

Wise at $84,747.00 based upon the 1989-1998 fund statement. *Id.* Wise did not respond to this letter. R. 43 ¶ 28.

In June 2008, Vanguard withdrew from the Pension Fund. R. 45 at 6. The Pension Fund estimated Vanguard's withdrawal liability to be $4.7 million. *Id.* During the course of settlement discussions, Vanguard told the Pension Fund which of Vanguard's customers had contributed to the Pension Fund in connection with the services Vanguard provided to their customers. *Id.* The Pension Fund determined that Vanguard would be able to recover portions of its withdrawal liability, which totaled $4,769,353, from the following entities in the following amounts: (1) Bridgestone ($3,951,090); (2) Bandag, Inc. ($427,850); (3) Wise as successor to Reynolds ($300,404); (4) Reichold Chemicals, Inc. ($49,759); and (5) CMM Transportation, Inc. ("CMM") ($40,238). *Id.* at 6, 7.

On January 23, 2009, Vanguard sent a letter to Wise informing Wise of Vanguard's withdrawal liability from the Pension Fund and of Wise's responsibility for its share of that withdrawal liability attributable to Wise's use of Vanguard employees. R. 43-10 at 2. The letter informed Wise that its share of the withdrawal liability was approximately $353,886.06. *Id.* Wise did not respond to this letter. R. 44 at 6.

On July 28, 2009, the Pension Fund issued Vanguard a Notice and Demand requesting payment of $4,769,353.60 in unfunded pension withdrawal liability. R. 45 at 7. As previously discussed, the Pension Fund then filed this action against Vanguard for collection of its unfunded pension withdrawal liability. R. 1 at 7-8. On

7

August 11, 2009, Judge Lindberg entered a Consent Judgment in favor of the Pension Fund requiring Vanguard to pay the above stated contributions plus interest. R. 6-2 at 6-8; R. 8. On September 1, 2011, the Pension Fund filed a citation to discover assets against Wise and CMM. R. 10. On September 2, 2011, the Pension Fund filed a post-judgment motion to enforce the indemnification agreement contained in the '94 September Schedule and order payment from CMM and Wise. R. 11; R. 12. On September 19, 2012, Judge Lindberg granted the Pension Fund's motion as to CMM but did not issue a ruling as to Wise. R. 67. Approximately a year later, the Pension Fund filed this motion requesting a ruling on its post-judgment motion to enforce the indemnification agreement and order payment against Wise. R. 68. Wise opposes the motion.

## STANDARD OF REVIEW

Fed. R. Civ. P. 69(a) states that the "execution [of a money judgment]—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located." In Illinois, a judgment creditor can enforce a judgment against assets held by a third party by causing a citation to discover assets to be issued once the trial court enters judgment in the underlying proceeding. 735 ILCS § 5/2-1402(a); *Stonecrafters, Inc. v. Wholesale Life Ins. Brokerage, Inc.*, 393 Ill. App. 3d 951, 958 (2009); *Bloink v. Olson,* 265 Ill. App. 3d 711, 714 (1994). This is so even if the third party was not a party to the underlying litigation. *Travelers Prop. Cas. Co. of Am. v. Rogan Shoes, Inc.*, 2011 WL 2637257, at *2 (N.D. Ill. July 6, 2011). A court then has the authority to enter

8

judgment against the third party in a supplementary proceeding if the record contains "some evidence" that the third party possesses assets of the judgment debtor to satisfy the judgment. *Schak v. Blom*, 334 Ill. App. 3d 129, 133 (2002); *Ericksen v. Rush Presbyterian St. Luke's Med. Ctr.*, 289 Ill. App. 3d 159, 166 (1997). "[T]he burden lies with the [judgment creditor] to show that the citation respondent possesses assets belonging to the judgment creditor." *Mid–American Elevator Co. v. Norcon, Inc.*, 287 Ill. App. 3d 582, 587 (1996).

## DISCUSSION

As a preliminary matter, the Court notes that the parties do not dispute whether Wise has the assets that the Pension Fund seeks. As such, if Wise is found liable for a portion of Vanguard's withdrawal liability, the Court has the authority to order payment against Wise under § 5/2-1402.

### I. Whether Wise is an "Employer" Under the MPPAA

First, Wise argues that it cannot be held liable for Vanguard's withdrawal liability because Wise is not an "employer" under the MPPAA. R. 45 at 8. Wise misunderstands the Pension Fund's theory of liability. The Pension Fund does not seek to enforce the indemnification provision in the September '94 Schedule pursuant to the MPPAA. Rather, it seeks to enforce the indemnification clause of the September '94 Schedule under contract law. R. 44 at 7-8. Wise's argument regarding its status under the MPPAA is irrelevant to whether Wise is liable for Vanguard's withdrawal liability as a result of the indemnification clause in the September '94 Schedule.

9

## II. Timeliness of the Pension Fund's Claim

Second, Wise argues that the Pension Fund's claim against Wise is untimely under 735 ILCS 5/13-206. R. 45 at 13. Section 5/13-206 states that "actions on . . . written contracts . . . shall be commenced within 10 years *after the cause of action accrued.*" 735 ILCS 5/13-206 (emphasis added). A cause of action on an indemnity agreement "does not arise until the indemnitee either has had a judgment entered against him for damages, or has made payments or suffered actual loss." *Gerill Corp v. Jack L. Hargrove Builders, Inc.*, 128 Ill. 2d 179, 199 (1989); *accord Cunningham Bros. Inc., v. Bail*, 407 F.2d 1165, 1169 (7th Cir. 1969) (holding that "no duty to do anything arises until the alleged indemnitee is adjudged liable"); *Kempel v. Martin Oil Marketing, Ltd.*, No. 95 C 1348, 1995 WL 733439, at *5 (N.D. Ill. Dec. 8, 1995) ("It is the happening of the occurrence that a party has agreed to indemnify against that triggers the indemnity obligation, and the indemnitor's failure to pay which gives rise to the cause of action.").

In this case, Vanguard was assessed withdrawal liability on August 11, 2009. R. 45 at 6, 7. The Pension Fund's cause of action against Vanguard, and its cause of action under the indemnification clause against Wise, accrued in 2009. As the Pension Fund filed this action in 2009, its claim is timely.

## III. Whether Wise is Contractually Liable for Vanguard's Withdrawal Liability from the Pension Fund

Wise also argues that it is not liable for Vanguard's withdrawal liability because it did not contractually assume either of the '94 Schedules from Reynolds

10

and is therefore not bound by the indemnification clauses contained in them. R. 45 at 9-12. In the alternative, Wise contends that should the Court find that it did assume Reynolds's '94 Schedules, the May '94 Schedule is the operative agreement, not the September '94 Schedule. R. 45 at 12, 13. Wise argues this is so because: (1) the Reynolds representative who signed the September '94 Schedule did not have authority to sign the agreement; and (2) Reynolds did not archive the September '94 Schedule in its contract administration department in accordance with Reynolds's internal policy. R. 45 at 45 at 12; R. 59 at 9-10. Thus, Wise contends that the September '94 Schedule is invalid and the May '94 Schedule with its handwritten qualification controls. R. 59 at 7, 8. Because the May '94 Schedule limits Reynolds's liability to assessments received by Vanguard prior to May 1, 1997, and Vanguard was assessed liability by the Pension Fund in 2009, Wise argues that it is not liable for Vanguard's withdrawal liability. R. 43-4; R. 59 at 8.

### A. Assumption of the '94 Schedules

Wise argues that it did not assume responsibility for the '94 Schedules because the Asset Purchase Agreement's Disclosure Schedule only lists the '89 Agreement. R. 45 at 9, 10; R. 59 at 3. Wise argues that the '89 Agreement and the '94 Schedules are separate agreements because neither of the '94 Schedules were "attached to [the '89 Agreement], let alone in existence" at the time the '89 Agreement was executed. R. 45 at 10-11; R. 59 at 4-5. Moreover, Wise claims that the '89 Agreement did not contain stipulations regarding future attachments. R. 62 at 6.

11

The Pension Fund, on the other hand, argues that the '89 Agreement and the '94 Schedules are indivisible because the '89 Agreement clearly and unambiguously anticipated the adoption and incorporation of future schedules. R. 44 at 8-9, 11; R. 54 at 7-8, 12. The Pension Fund asserts that Wise assumed both of the '94 Schedules when it assumed the '89 Agreement. R. 44 at 8-9; R. 54 at 7. Moreover, the Pension Fund argues that Wise impliedly assumed the September '94 Schedule by making payments according to the terms and conditions in the September '94 Schedule. R. 44 at 9, 10; R. 54 at 8.

Whether Wise expressly assumed the '94 Schedules, and is bound by their indemnification clauses, is a question of contract interpretation. As a general rule, a corporation may purchase the assets of another corporation without assuming the seller corporation's liabilities. *Upholsterers' Intern. Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1325 (7th Cir. 1990) (citing *Travis v. Harris Corp.*, 565 F.2d 443, 446 (7th Cir. 1977)). There are exceptions to this rule, such as when there is an express or implied agreement to assume liability. *Id.* Contract interpretation is governed by state law. *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944 (1995). Illinois requires the Court "to give effect to the parties' intentions when interpreting a contract." *Gallagher v. Lenart,* 226 Ill. 2d 208, 232 (2007). Generally, "the best indication of the parties' intent is the plain meaning of the contract's language." *Id.* at 233. "[The] primary goal in construing [a] contract is to give effect to the parties' intent as expressed in the terms of their written agreement." *Id.* If the terms of the contract are unambiguous, the court must

enforce the contract as written. *Lewitton v. ITA Software, Inc.,* 585 F.3d 377, 380 (7th Cir. 2009).

### 1. The Language of the '89 Agreement

It is unclear from the plain language of the '89 Agreement that it anticipated, and intended to incorporate future schedules between Vanguard and Reynolds. Vanguard points to the following portion of the '89 Agreement in support of its argument that the '94 Schedules were specifically incorporated into the '89 Agreement: "Vanguard will pay its employees and provide all fringe benefits *in accordance with* the Schedule(s) which are attached hereto and made part hereof." R. 43-3 (emphasis added); R. 43 ¶ 13. The terms "in accordance with" do not mean that the '89 Agreement anticipated that there necessarily would be future schedules between Vanguard and Reynolds. Rather, this clause merely provides that if Vanguard and Reynolds agreed to other payment schedules in the future that payment will be made "in accordance with" those schedules. Absent language specifically incorporating future schedules, the Court cannot say that Wise assumed any future schedules by assuming the '89 Agreement alone.

### 2. The Parties' Conduct

Even absent express language, however, an implied agreement to be bound by the terms of an agreement can arise through a party's course of conduct. *Gariup v. Birchler Ceiling & Interior Co.,* 777 F. 2d 370, 373 (7th Cir. 1985). *See also Moriarty v. Larry G. Lewis Funeral Dirs. Ltd.,* 150 F. 3d 773, 777 (7th Cir. 1998) ("The general principles of contract law permit a party to adopt an agreement by its

13

conduct."); *In re Vic Supply Co., Inc.,* 227 F. 3d 928, 932 (7th Cir. 2000) ("Acceptance can be effectuated by performance as well as by signature."). In this case, Wise's conduct after taking over the Muscle Shoals plant establishes that Wise assumed the September '94 Schedule. Subsequent to Wise taking over the plant in April 1999, Vanguard billed Wise in accordance with the rates contained in the September '94 Schedule. Wise paid those bills. R. 44 at 9. Wise never asserted that it should be paying the rates contained in the '89 Agreement or the May '94 Schedule. R. 44 at 10. Wise's payments to Vanguard continued in accordance with the September '94 Schedule until Wise terminated the contractual relationship with Vanguard on January 31, 2000. R. 44 at 6. Wise never executed another schedule with Vanguard. Wise's conduct is unambiguously consistent with an agreement to be bound by the terms of the September '94 Schedule. The Court concludes that Wise also impliedly agreed to be bound by the terms of the September '94 Schedule.

### B. The September '94 Schedule is Operative

Wise claims, in the alternative, that should the Court find that it is bound by the '94 Schedules, it is the May '94 Schedule that controls. Wise argues that the September '94 Schedule was not properly executed in that it was not signed by an authorized Reynolds representative and it was not filed with Reynolds's contracts administration department. R. 59 at 5. If so, Wise's liability for Vanguard's unfunded pension withdrawal liability terminated on May 1, 1997 because of the handwritten qualification. R. 59 at 7-8.

Wise's assertion that the September '94 Schedule is invalid because it was signed by someone who did not have authority to bind Reynolds is incorrect. R. 62 at 8. A principal is bound by a contract entered into by the principal's agent on his behalf if the agent had actual or apparent authority to bind him, or if the principal subsequently ratifies the agreement. *N. Assurance Co. of Am. v. Summers,* 17 F.3d 956, 960 (7th Cir.1994). Apparent authority exists where actions of the principal give the other contracting party the reasonable impression that the agent has authority to enter into an agreement on behalf of the principal. *Id.* at 962. Here, there was no reason for Vanguard to believe that Hutchins, who was Reynolds's fleet manager, did not have the appropriate authority to bind Reynolds. Moreover, even if Hutchins did not have the authority to bind Reynolds, Reynolds subsequently ratified the September '94 Schedule by conducting itself in accordance with the terms and conditions of that document. R. 44 at 5.

The Court also rejects Wise's assertion that it is not bound by the September '94 Schedule because that schedule was not filed with Reynolds's contracts administration department. Reynolds's internal filing process is irrelevant to the September '94 Schedule's validity. Even if it was relevant—and Wise has not cited any authority supporting that counterintuitive premise—the parties' conduct indicates that they believed it was valid and binding. Vanguard and Reynolds acted in accordance with the terms and conditions of the September '94 Schedule for ten years. And Wise continued to abide by the terms of the September '94 Schedule after it acquired the plant. At no time during the remainder of Wise and Vanguard's

contractual relationship did Wise contest the terms and conditions of the September '94 Schedule. Wise's purported reliance on the schedule's absence from its files is belied by its payments to Vanguard according to the September '94 Schedule's terms. As such, Wise intended to be, or at the very least, consented to be bound by the terms and conditions of the September '94 Schedule.

In sum, the Court finds that the parties' conduct in abiding by the terms and conditions of the September '94 Schedule demonstrates their intent to be bound by it. As such, the Court finds that Wise impliedly assumed the September '94 Schedule and is bound its indemnification clause.

### IV. Whether Wise Must Be the Proximate Cause of Vanguard's Withdrawal Liability

Finally, Wise argues that it is not liable for Vanguard's withdrawal liability because it was not the proximate cause of the withdrawal. R. 59 at 13-14. Specifically, Wise claims that the Pension Fund failed to account for other factors that could have contributed to Vanguard's withdrawal from the Pension Fund in the eight years between Wise's termination of Vanguard's services and Vanguard's withdrawal from the Pension Fund. For example, that Vanguard's withdrawal may have been caused by the loss of other customers Vanguard leased employees to. R. 59 at 13-14.

In support of its causation argument, Wise cites *TAS Distributing Co. v. Cummins Engine Co.*, which holds that in an Illinois contract claim the plaintiff must prove "with a reasonable degree of certainty [that damages] can be traced to [the] defendant's wrongful conduct." 491 F.3d 625, 633 (7th Cir. 2007). In *TAS*,

16

however, there was a question of whether the defendant's conduct caused the plaintiff's lost profits. There is no question of lost profits causation here. Rather, the plain terms of the contract ambiguously provide the circumstances under which Wise agreed to indemnify Vanguard for a withdrawal liability. The September '94 Schedule provides, "Customer [now Wise] agrees to defend, indemnify and hold Vanguard harmless from unfunded pension liability . . . as a result of supplying leased employees to any of Customer's [Wise's] terminals." R. 32-5 at 2. There is no dispute that Vanguard incurred a liability. Whether Wise "caused" Vanguard to incur the liability is irrelevant under the plain language of the contract.

## V.   Damages

Because Wise is contractually bound by the indemnification clause in the September '94 Schedule, damages must be determined. The Pension Fund calculated Wise's withdrawal liability by dividing the amount contributed by Vanguard in the ten years preceding the withdrawal by the total amount of contributions made by all participating employers over the same ten years. R. 61 at 7-8. The Pension Fund claims it was able to calculate Wise's total amount of liability with specificity because the Pension Fund maintained separate accounts for each of Vanguard's previous employee groups. R. 44 at 12. Wise, on the other hand, argues that the Pension Fund's calculation of Wise's total amount of liability is not established with "a reasonable degree of certainty." R. 59 at 14. Specifically, Wise contends that the calculation used by the Pension Fund offers no support that Wise's cancellation caused a proportional amount of damage and assumes that

there were no other intervening causes that also contributed to Vanguard's withdrawal. R. 59 at 14-15. Neither party offers relevant case law to support such contentions, and the Court has already rejected this "intervening cause" theory in the context of liability.

The briefing on the damage issue has been limited. The Court will request an updated damage figure from the Pension Fund and further briefing on how the damages should be calculated. This matter is set for status on March 6, 2015 at 9 a.m. to discuss these issues.

## CONCLUSION

For the forgoing reasons, the Pension Fund's motion to enforce the indemnification agreement between Vanguard and Wise is granted. The case is set for status on March 6, 2015 at 9 a.m. to discuss damages.

ENTERED:

*Thomas M Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: February 24, 2015