UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND AND CHARLES WHOBREY, Trustee, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 09 C 4721 |
| VANGUARD SERVICES, INC., et al., | ) ) | |
| Defendants, | ) ) | Judge Thomas M. Durkin |
| and | ) ) | |
| Bridgestone/Firestone, Inc., | ) ) | |
| Citation Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Central States Fund, Southeast and Southwest Area Pension Fund and Howard McDougall ("Pension Fund") brought this action against Vanguard Services, Inc. and other Vanguard entities (together, "Vanguard") for collection of contributions and withdrawal liability under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.* R. 1. Years prior to the motion at issue, a consent judgment was entered in the Pension Fund's favor, and Vanguard was ordered to pay $4,769,353.60 in unfunded pension withdrawal liability. R. 9. The Pension Fund thereafter sought to enforce various indemnification agreements between Vanguard and its former clients as citation respondents in order to satisfy the consent judgment. At issue here is the Pension Fund's attempt to enforce

indemnification agreements between Vanguard and citation respondent Bridgestone Americas Tire Operations, LLC ("BATO"), successor in interest to Bridgestone/Firestone, Inc. ("Bridgestone"), pursuant to which the Pension Fund asserts that BATO is liable for the bulk of Vanguard's withdrawal liability. R. 100. A citation to discover assets was issued to BATO for that purpose (the "Citation"). R. 103. Now before the Court is BATO's motion to dismiss the Citation. R. 107. For the following reasons, that motion is granted.

## Background

***The consent judgment.*** Vanguard previously operated as a labor leasing company that provided clients with temporary personnel. Vanguard paid the employees and retained responsibility for collective bargaining, fringe benefits, taxes and payroll, and was obligated to remit contributions to the Pension Fund—a multiemployer pension fund under ERISA—on behalf of its covered employees. Vanguard then passed on certain employee costs to its clients through labor lease agreements, some of which required clients to indemnify Vanguard for withdrawal liability associated with the Pension Fund.

On July 12, 2008, Vanguard permanently ceased to have an obligation to contribute to the Pension Fund, triggering a complete withdrawal within the meaning of ERISA, 29 U.S.C. § 1383. Vanguard was assessed withdrawal liability in the principal amount of $4,769,353.60. Vanguard and the Pension Fund subsequently entered into a settlement agreement pursuant to which Vanguard agreed to the entry of a consent judgment (such agreement, the "Settlement Agreement," and such

judgment, the "Consent Judgment"). Pursuant to the Settlement Agreement, the Pension Fund agreed "not to execute the Consent Judgment or enforce against, or otherwise attempt to collect any monies due under the Consent Judgment from [Vanguard]." R. 93-2 at 13. But the Settlement Agreement expressly does not bar the Pension Fund "from taking any act to assert claims under the Lease Agreements including post-judgment discovery and taking action against third-parties." *Id.* And it grants the Pension Fund a "first position security interest" in claims under the lease agreements. *Id.* ¶ 7.

On August 11, 2009, the Honorable George W. Lindberg—assigned to this case at the time—entered the Consent Judgment against Vanguard in the amount of $4,796,660.08, representing the unpaid withdrawal liability principal and contributions, plus statutory damages and interest.[1]

***Prior supplementary proceedings for indemnification.*** Approximately two years later, through supplementary proceedings under 735 ILCS § 5/2-1402 in this action, the Pension Fund moved to enforce withdrawal liability indemnification provisions contained in Vanguard's labor lease agreements with former clients CMM Transportation, Inc. ("CMM") and Wise Alloys, LLC ("Wise"). R. 16; R. 17. The Pension Fund issued citations to discover CMM and Wise's assets for that purpose. R. 10. CMM's labor lease agreement obligated it to pay "any withdrawal liability arising out of or in connection with any action or inaction by [CMM]." R. 18-2. And the Wise agreement obligated it to pay "unfunded pension liability that might be

---

[1] This Court revived the Consent Judgment on September 18, 2018. R. 96.

assessed against Vanguard . . . as a result of supplying lease employees to any of [Wise's] terminals." R. 13-2. CMM and Wise objected to the motions to enforce on various grounds, but ultimately the indemnification provisions were enforced and payment ordered against them for their proportionate shares of withdrawal liability.[2]

### *BATO lease agreements and Vanguard's successor's bankruptcy filing.*

Like CMM and Wise, Bridgestone and Bandag—an entity Bridgestone acquired in 2017—previously leased labor from Vanguard pursuant to written agreements (such agreements together, the "BATO Agreements"). The agreement between Vanguard and Bridgestone was executed in 1992 and indicates that it will "run until cancelled by either party" ("Bridgestone Agreement"). It provides further that:

> [Bridgestone] will indemnify and hold Vanguard harmless and defend against any loss, expense, fine, penalty or liability resulting from actual or alleged violation of any laws or regulations concerning employment or the application of any law concerning termination of employment caused solely by [Bridgestone.]

R. 101-3 at 3, 7. The Bridgestone Agreement also indicates that Bridgestone will "pay Vanguard for services provided in accordance with the attached SCHEDULES or any AMENDMENT(s) thereto." *Id.* at 4. One such schedule, executed in July 2006, reflects the parties' agreement to certain "rates, fees, charges and conditions" and indicates that "such wage rates, fees and amounts shall be invoiced accordingly." R. 109, Ex. C to Sprau Aff., p. 1. It also states:

> In accordance with the collective bargaining agreement applicable to Vanguard's employees, Bridgestone/Firestone will be billed for the exact cost of the following fringe benefits and taxes, or any subsequent

---

[2] That is, $40,238.68 plus interest as to CMM in 2012, and $300,404.69 plus interest as to Wise in 2015. R. 67; R. 73; R. 83.

> increases thereof which become effective under the Labor Agreement, or
> as a result of any change in Federal or State law or rules or regulations.

*Id.* at 4, ¶ V. The schedule thereafter sets forth the weekly pension contributions per employee. *Id.* at 5.

In turn, Vanguard and Bandag executed an agreement in 1989 regarding Bandag's labor leasing ("Vanguard-Bandag Agreement"). And Bandag and another defendant, Vanguard sister company VMT Companies, Inc. ("VMT"), entered into a labor leasing agreement effective as of 1995 ("VMT-Bandag Agreement," and the Vanguard-Bandag and VMT-Bandag Agreements together, "Bandag Agreements"). R. 101 at 5. Like the Bridgestone Agreement, the Bandag Agreements also state that they run "until cancelled by either party." R. 101-5 at 5; R. 101-6 at 5. Schedules to the Bandag Agreements contain the following clause:

> Any withdrawal liability related to the collective bargaining agreement
> and arising out of or in connection with any action or inaction of
> Vanguard, shall be the responsibility of Vanguard; and any withdrawal
> liability arising out of or in connection with any action or inaction by
> Bandag shall be Bandag's responsibility.

R. 101 at 4.

Ultimately, both Bandag and Bridgestone cancelled their respective agreements with Vanguard. While the parties apparently agree that the Bandag Agreements were cancelled prior to Vanguard's 2008 decision to withdraw from the pension plan, they dispute whether Bridgestone did. Indeed, the Pension Fund claims that the Bridgestone Agreement was cancelled in 2009, while BATO contends that it was cancelled in 2007. Regardless, according to the Pension Fund, the termination of

5

Vanguard's services under the BATO Agreements contributed to Vanguard's complete withdrawal from the fund.

The Pension Fund seeks to enforce the BATO Agreements' indemnification provisions, requesting a judgment in the amount of $4,378,940.93 plus interest and attorney's fees and costs. The Pension Fund issued the Citation in connection with those efforts. BATO now moves to dismiss the Citation under Rules 12(b)(1) and (6), arguing that: (1) the indemnification provisions terminated with the BATO Agreements; (2) the Court lacks jurisdiction to enter a judgment against it; and (3) the Consent Judgment is not binding on BATO. BATO also contends that the Pension Fund lacks standing to pursue Vanguard's claims against it because Vanguard's successor in name, MC3, Inc. ("MC3") filed for Chapter 7 bankruptcy in August 2015 and the claims therefore belong to the bankruptcy estate.

### Standard[3]

A Rule 12(b)(1) motion tests whether the Court has subject matter jurisdiction. *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir.

---

[3] The Pension Fund challenges whether Rule 12(b)(6) applies to supplementary proceedings under 735 ILCS § 5/2-1402, and indicates that it has "not been able to find any cases where a supplementary proceeding was dismissed under that rule." R. 109 at 1 n.1. However, the Court located *Zausa v. Pellin*, 2017 WL 2311232 (N.D. Ill. May 26, 2017), a standalone lawsuit to enforce a judgment under § 1402 in which the court dismissed the action under Rule 12(b)(6) (among others) for failure to state a claim. But the Court recognizes that this supplementary proceeding differs from *Zausa*, because this proceeding was filed as part of the underlying action, and therefore there is no complaint to construe. Nevertheless, in keeping with the spirit of Rule 12(b)(6) and because there does not appear to be any confusion about the basis for BATO's alleged liability, the Court gives deference to the allegations in the Pension Fund's motion to enforce the indemnification agreement as to BATO (R. 100; R. 101) in assessing the parties' various arguments for and against dismissal.

2009). When evaluating a motion to dismiss under Rule 12(b)(1), if there are no factual disputes, the Court accepts the allegations in the complaint as true, and draws all reasonable inferences in the plaintiff's favor. *Bultasa Buddhist Temple of Chi. v. Nielsen*, 878 F.3d 570, 573 (7th Cir. 2017). But "a plaintiff faced with a 12(b)(1) motion to dismiss bears the burden of establishing that the jurisdictional requirements have been met." *Ctr. for Dermatology and Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588-89 (7th Cir. 2014).

In contrast, a Rule 12(b)(6) motion challenges the "sufficiency of the complaint." *Berger v. Nat. Collegiate Athletic Assoc.*, 843 F.3d 285, 289 (7th Cir. 2016). Generally, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully- harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). " 'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 366 (7th Cir. 2018) (quoting *Iqbal*, 556 U.S. at

678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Tobey v. Chibucos*, 890 F.3d 634, 646 (7th Cir. 2018).

## Analysis

Proceedings to collect a judgment must "accord with the procedure of the state where the court is located." Fed. R. Civ. P. 69(a). Two provisions of Illinois law govern supplementary proceedings to collect a judgment. The first, 735 ILCS 5/2-1402, provides that a judgment creditor can enforce a judgment against assets held by a debtor or third party by issuing a citation to discover assets. 735 ILCS § 5/2-1402(a); *Stonecrafters, Inc. v. Wholesale Life Ins. Brokerage, Inc.*, 915 N.E.2d 51, 56 (Ill. App. Ct. 2009). The judgment creditor "need only have a reasonable belief that third parties hold judgment debtor assets" to issue such a citation. *In re Emerald Casino, Inc.*, 223 F. Supp. 3d 740, 751 (N.D. Ill. 2016). And courts generally look for "some evidence" that the third party possesses assets of the judgment debtor to support that belief. *Schak v. Blom*, 777 N.E.2d 635, 639 (Ill. App. Ct. 2002). The second provision is Illinois Supreme Court Rule 277. That rule requires the party to whom the citation is directed "to appear for examination . . . concerning the property or income of or indebtedness due the judgment debtor." Ill. Sup. Ct. R. 277(c)(3). The rule also provides for discovery, and expressly allows "[a]ny interested party" to "subpoena witnesses and adduce evidence as upon the trial of any civil action." Ill. Sup. Ct. R. 277(e). In the end, the judgment creditor has the burden to show that the citation respondent possesses assets belonging to it. *Mid-American Elevator Co. v. Norcon, Inc.*, 679 N.E.2d 387, 390 (Ill. App. Ct. 1996).

8

## I.      Effect of Termination on Indemnification Obligation

At the outset, BATO contends that the Citation should be dismissed because any payment obligation terminated when the BATO Agreements were cancelled, and the BATO Agreements were cancelled before Vanguard's withdrawal liability arose. BATO points out that each agreement states that it "shall run until cancelled by either party," and that none contains a survival clause. R. 108 at 6-7. BATO relies on the Third Circuit's decision in *Nitterhouse Concrete Products, Inc. v. Glass, Molders, Pottery, Plastics & Allied Workers International Union, & Local Union 201B AFL-CIO CLC*, 763 Fed App'x 164 (3d Cir. 2019). In *Nitterhouse*, the court affirmed the district court's conclusion that indemnification provisions did not cover withdrawal liability incurred after the termination of the agreements because there was "no explicit language" indicating that the liability "extended beyond the expiration of the agreements." *Id.* at 6-7 (citing *Nitterhouse*, 2018 WL 656013, at *19 (M.D. Pa. Feb. 1, 2018)).

But the Pension Fund argues that unlike the agreement in *Nitterhouse*, the Bridgestone Agreement was still in effect when Vanguard's withdrawal liability accrued, and as such, Vanguard's right to payment vested and survived the subsequent termination of the agreement. R. 109 at 6-7. The Pension Fund offers an April 30, 2009 letter from Bridgestone to Vanguard indicating that Bridgestone was terminating the agreement effective May 30, 2009—nearly eleven months after Vanguard's withdrawal from the Pension Fund. BATO complains that this letter was offered "without explanation or context," and that it presents "a fact issue as to the

9

timing and effectiveness of the termination of Vanguard's services to Bridgestone" as to which it "is entitled to a full trial and jury." R. 110 at 3. But the Court does not view this dispute as a basis for dismissal. Indeed, summary proceedings under 735 ILCS § 5/2-1402 allow for broad discovery and an evidentiary hearing, and permit third party citation respondents like BATO to present any defenses they might have asserted against the judgment debtor. *See Dexia Credit Local v. Rogan*, 619 F.3d 612, 624 (7th Cir. 2010) (735 ILCS 5/2-1402 "permit[s] the court to determine the rights of third parties"); *JPMorgan Chase Bank v. PT Indah Kiat Pulp & Paper*, 2012 WL 2254193, at *2 (N.D. Ill. June 14, 2012) ("Broad discovery is thus allowable in citation proceedings involving a third-party"); *see also* Fed. R. Civ. P. 69(a)(2) ("in aid of the judgment or execution, the judgment creditor . . . may obtain discovery from any person . . . as provided in [the federal rules governing pre-trial discovery]"); *see also Stonecrafters, Inc.*, 915 N.E.2d at 58 (the rights of a "third-party citation respondent can be adjudicated in citation proceedings"). Indeed, the Seventh Circuit has held that following discovery in a § 1402 proceeding, "[t]he creditor is then entitled to a trial or evidentiary hearing on the evidence." *GE Betz, Inc. v. Zee Co.*, 718 F.3d 615, 629 (7th Cir. 2013).

Further, the Pension Fund argues that unlike in *Nitterhouse*, the BATO Agreements' terms and the parties' conduct demonstrate that the indemnification obligations survived, even assuming the agreements were terminated before withdrawal liability accrued. The Pension Fund points to the fact that: (1) the Bridgestone Agreement obligates Bridgestone to pay the "exact cost" of the pension

10

benefits, including "any subsequent increases thereof;" and (2) the Bandag Agreements obligate Bandag to pay *any* withdrawal liability caused by its action or inaction, and Judge Lindberg previously enforced the very same language against CMM post-termination. R. 109 at 8. According to the Fund, this language reflects that the parties intended the payment obligations to include "future withdrawal liability, not just withdrawal liability incurred during the duration" of the agreements. *Id.* The Pension Fund also points out that when Bandag terminated the Vanguard-Bandag Agreement, Vanguard immediately sent Bandag a letter reminding it of its continuing obligation for potential withdrawal liability. *See* 109-10 (letter indicating that although no withdrawal liability has been assessed, Bandag "would be responsible for any withdrawal liability incurred by Vanguard . . . as a result of [Bandag's] cancellation of our services").

Other than to complain that the Pension Fund's offerings "at worst" demonstrate that the indemnification provisions "suffer from an ambiguity to which the parties are entitled to a finding of fact as to their intent," BATO offers no meaningful response. R. 110 at 3-4. As discussed, discovery and such a fact finding can occur within this supplementary proceeding—to determine when the BATO Agreements terminated, and/or whether the parties intended the indemnification provisions to survive that termination. The Court therefore declines to dismiss the Citation on this basis.

11

## II.     Jurisdiction Under 735 ILCS § 5/2-1402

BATO next argues that the Court lacks jurisdiction over the Citation because: (1) the Pension Fund's claim is not an unliquidated "asset" under 735 ILCS § 5/2-1402; and (2) the Pension Fund has not shown that Bridgestone and/or Bandag "caused" the liabilities within the meaning of the BATO Agreements.

BATO first points to the Illinois Appellate Court's decision in *Ericksen v. Rush Presbyterian St. Luke's Medical Center* to argue that indemnity claims may not be pursued as "assets" under 735 ILCS § 5/2-1402 at all. *See* R. 108 at 7 (quoting *Ericksen*, 682 N.E.2d 79, 84 (Ill. App. Ct. 1997)). But *Ericksen* did not hold that courts generally lack jurisdiction over supplementary proceedings to enforce indemnification provisions. Instead, the court declined to enter a judgment against the citation respondent in that case because there was no dispute that the indemnification provision did not apply (and as such there was no "asset"). *See generally Ericksen*, 682 N.E.2d 79. Nor does *Ericksen* require a judgment creditor to demonstrate prior to the issuance of a citation that a third party possesses assets that belong to it as BATO suggests; to the contrary, *Ericksen* "establish[ed] only that the court cannot *enter a judgment* against a third-party who does not possess any assets of the judgment debtor." *See JPMorgan Chase Bank*, 2012 WL 2254193, at *2 (emphasis added). Here, the parties *do* dispute whether and if so to what extent the indemnification provisions apply to Vanguard's withdrawal liability. Those issues can be resolved in this proceeding, and only then can the Court determine whether BATO holds any assets sufficient to confer jurisdiction to enter judgment against it. *See In*

12

*re Emerald Casino, Inc.*, 223 F. Supp. 3d at 752-53 (citations were properly issued where "no potential avenue for recovery has been thoroughly ruled out by a binding judgment, and neither movant has responded to the citations to the extent necessary to establish whether they hold assets of the judgment debtor"). To hold otherwise at this stage would be premature and improper.

BATO next argues that the Court lacks jurisdiction because any claim is "unliquidated" in that its amount cannot be "ascertained or . . . readily . . . calculated." R. 108 at 8 (citing *Matter of Knight*, 55 F.3d 231, 235 (7th Cir. 1995)). But the Court agrees with the Pension Fund that the same methodology used to compute CMM and Wise's proportionate share of withdrawal liability can be used to compute BATO's. *See* R. 109 at 11-12 (quoting previous court orders noting that the withdrawal liability "damages are fixed and certain" and that the Pension Fund "used a reasonable methodology" to compute CMM and Wise's proportionate share).

Finally, BATO contends that the claims are unliquidated because the Pension Fund has not established that Bridgestone and Bandag caused Vanguard to incur the liability within the meaning of the BATO Agreements. More specifically, BATO points out that Bridgestone is not contractually obligated to indemnify Vanguard unless Bridgestone "solely" caused the withdrawal liability, R. 108 at 9 (citing R. 101-3, Art. I ¶ 6), and Bandag need indemnify Vanguard only for liabilities "arising out of or in connection with any action or inaction by Bandag," R. 101-7 ¶ III; R. 101-8 ¶ III. BATO argues that both determinations require a fact finding. But this argument misses the mark: the CMM indemnification provision contained the very same

"causation" language as the Bandag Agreements here. *See* R. 67 at 1. And more to the point, discovery and briefing on BATO's defenses is permissible, including on this issue of causation. Accordingly, the Court declines to dismiss the Citation for lack of jurisdiction at this stage.[4]

## III. Whether the Withdrawal Liability Award is Binding on BATO

BATO next argues that it is not bound by the withdrawal liability award under collateral estoppel principles, both because it was not "actually litigated" in the underlying case, and because BATO was not a party in any event. BATO also contends that under Illinois law, the Pension Fund must prove that the withdrawal liability set forth in the Settlement Agreement was "reasonable." R. 108 at 11 (citing *Guillen ex rel. Guillen v. Potomac Ins. Co. of Ill.*, 785 N.E.2d 1, 14 (Ill. 2003)). BATO argues that Vanguard had no incentive to ensure the award's reasonableness, because it agreed only "to pay a small portion of the [amount] in exchange for [the Pension Fund's] agreement not to pursue it . . . for the much larger balance." R. 110 at 7. In so arguing, BATO again insists that it is entitled to "a proceeding with service, full discovery and an opportunity to rebut any showing that the Settlement Agreement . . . was reasonable," as well as "to test [Vanguard's] motivations." R. 108 at 12. But assuming that the Pension Fund must make such a showing, as discussed,

---

[4] The Court notes that if Bridgestone cancelled the Bridgestone Agreement only after Vanguard's complete withdrawal as the Pension Fund contends, there is a question as to whether that cancellation could have "solely" caused the withdrawal liability such that Bridgestone (now BATO) would be contractually obligated to indemnify Vanguard.

BATO can present its defenses to the Pension Fund's claims at an evidentiary hearing in the context of this citation proceeding. This is not a basis for dismissal.

## IV. Central States' Standing to Pursue Vanguard's Claims

Finally, BATO argues that the Pension Fund lacks standing to pursue Vanguard's causes of action under the BATO Agreements because: (1) Vanguard did not assign the indemnification claims to the Pension Fund; and (2) the claims at issue belong to MC3's bankruptcy estate.

The Pension Fund does not meaningfully argue that it is Vanguard's assignee. And for good reason; the Settlement Agreement only grants the Pension Fund a "first position security interest" in the claims at issue, and the Pension Fund does not contend that it has foreclosed upon that interest. R. 93-2 ¶ 7. Nevertheless, the Pension Fund has standing as judgment creditor to pursue the claims of judgment debtor Vanguard—at least to the extent that Vanguard itself can pursue them. *See For Your Ease Only, Inc. v. Calgon Carbon Corp.*, 2009 WL 3255317, at *2 (N.D. Ill. Oct. 6, 2009) (judgment creditor has rights equal to judgment debtor because judgment creditor "stands in the shoes of the judgment debtor").

But as discussed, Vanguard's successor in name, MC3, filed for Chapter 7 bankruptcy in August 2015. Generally, a Chapter 7 bankruptcy debtor's pre-bankruptcy legal claims belong to the bankruptcy estate, and as such can be administered solely by the bankruptcy trustee. *See* 11 U.S.C. § 541(a)(1) (commencement of a bankruptcy case creates an estate which consists of all legal and equitable interests in property as of that time); *see also Biesek v. Soo Line Railroad*

15

*Co.*, 440 F.3d 410, 413 (7th Cir. 2006) (pre-bankruptcy claims are part of the estate and belong to the Trustee). This is true even for legal claims that were not filed prior to the bankruptcy case, provided the actions giving rise to the claims occurred prior thereto. *See In re Polis*, 217 F.3d 899, 902 (7th Cir. 2000). As such, "[i]mmediately upon the filing of a bankruptcy petition, § 362 of the bankruptcy code provides for an automatic stay of efforts outside the bankruptcy proceeding to collect debts from the bankrupt debtor." *In re Radcliffe*, 563 F.3d 627, 630 (7th Cir. 2009). Nevertheless, a creditor may seek relief from the automatic stay in order to pursue a claim to the debtor's pre-bankruptcy petition legal claims. *See Agri-Best Holdings, LLC v. Atlanta Cattle Exch., Inc.*, 812 F. Supp. 2d 898, 900 (N.D. Ill. 2011) (although generally a trustee has the exclusive right to pursue claims on behalf of the debtor's estate, "that general principle yields where, as here, a creditor is given relief from the automatic stay to exercise its rights to the debtor's pre-petition assets, including the debtor's pre-petition legal claims").

Here, there is no dispute that any indemnification obligation BATO may have arose before MC3 filed its Chapter 7 bankruptcy petition. But the Pension Fund contends that the claims for indemnification are nevertheless not part of Vanguard's bankruptcy estate because Vanguard did not have the "unfettered ability to possess and own" them when the bankruptcy proceedings commenced. R. 109 at 15-16 (quoting *Matter of Rolf*, 34 B.R. 159, 161 (Bankr. N.D. Ill. 1983)). In support, the Pension Fund points out that the Settlement Agreement granted it a "first position security interest" in Vanguard's claims for indemnification, and indicates that if

16

Vanguard were to file for bankruptcy, the Pension Fund may pursue the claims against Vanguard's customers. *Id.* at 16 (citing 93-2 ¶ 18). The Pension Fund also points out that the bankruptcy trustee agreed to the entry of an order that would allow the Pension Fund to pursue the claims through relief from the automatic stay. *Id.*, Exs. 8 and 9. But the Pension Fund cites nothing to indicate that property subject to a security interest falls outside of the bankruptcy estate as a matter of course. And while the Pension Fund attaches the agreed order that would allow it to pursue the indemnification claims if entered, it does not demonstrate or claim that it was. Accordingly, absent evidence of an assignment, that the automatic stay was lifted to allow the Pension Fund to pursue the indemnification claims, or that the Pension Fund otherwise has the right to pursue the claims notwithstanding MC3's bankruptcy, the Citation is dismissed for the Pension Fund's failure to demonstrate standing. *See Lightspeed Media Corp. v. Smith*, 830 F.3d 500, (7th Cir. 2016) (in a Chapter 7 liquidation case, "*only* the trustee has standing to prosecute or defend a claim belonging to the estate") (emphasis in original).

## Conclusion

For the reasons stated, BATO's motion to dismiss the Citation, R. 107, is granted. This dismissal is without prejudice to the Pension Fund's refiling its supplemental proceeding either as part of this action, or, if appropriate, as a standalone case, provided it can demonstrate its standing to do so. Accordingly, any future request for citation shall indicate on its face or in a document appended thereto

the basis for the Pension Fund's standing to pursue the indemnification claims at
issue.

ENTERED:

_____

Honorable Thomas M. Durkin
United States District Judge

Dated: October 30, 2020